**UNITED STATES of America, Plaintiff,**

v.

**Ronald SHAMBLIN, Defendant.**

**No. CRIM.A. 2:03–00217.**

United States District Court, S.D. West Virginia, Charleston Division.

June 30, 2004.

---

758

W. Chad Noel, United States Attorney's Office, Charleston, WV, for United States.

Donald L. Stennett, Charleston, WV, for Defendant Ronald Shamblin.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

A criminal defense attorney seeking to test the limits of the United States Supreme Court's days-old decision in *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), could not have conjured a more fitting defendant than Ronald Shamblin. Shamblin, who had previously pleaded guilty to Conspiracy to Manufacture Methamphetamine in violation of 21 U.S.C. § 846, was sentenced to 240 months in prison on June 21, 2004. The calculation of Shamblin's sentence included so much offense conduct, so much relevant conduct, and so many enhance-

ments that Shamblin's sentencing range under the United States Sentencing Guidelines was, literally, off the chart. The guidelines indicated that Shamblin should receive a sentence of life imprisonment. Because no amount of methamphetamine was charged in his indictment, however, Shamblin's sentence was limited, by the Fourth Circuit's interpretation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to the maximum sentence under the relevant statute.[1] Now, on the last day that I may review his sentence for clear error under Fed. R.Crim.P. 35(a), Shamblin has benefited again from the Supreme Court's *Apprendi* decision, as further explained in *Blakely*. Yesterday, the defendant filed a Motion to Correct Unlawful Sentencing Within Seven Days [Docket 69]. For the reasons stated below, I have **GRANTED** the motion [Docket 69], and **RESENTENCED** Shamblin in accordance with *Apprendi* and *Blakely*.

## I. Background

On August 21, 2003, law enforcement officers with the Drug Enforcement Agency, the West Virginia Metropolitan Drug Enforcement Network Team, and the City of St. Albans Police Department searched Ronald Shamblin's home. They found a gallon jug of iodine and several bottles of lye and hydrogen peroxide, along with papers they believed to be drug distribution records and a computer printout with instructions on how to manufacture methamphetamine. The officers found a loaded shotgun under a mattress and four other loaded firearms locked in a gun case.

When Shamblin drove by his home early in the morning of August 22, 2003, he was stopped and arrested. On September 16, 2003, a federal grand jury sitting in Charleston, West Virginia, returned a sealed indictment against him, charging him with conspiracy to manufacture quantities of methamphetamine in violation of 21 U.S.C. § 846. Shamblin pleaded guilty to the charge contained in the indictment on October 24, 2003. He pleaded without the benefit of a plea agreement with the United States. At the plea hearing, the court conducted a colloquy to determine that there was a factual basis for the plea. While admitting to conduct sufficient to sustain his plea, Shamblin presented his involvement in the conspiracy to manufacture methamphetamine as minimal:

THE COURT: Tell me what you did that makes you believe you're guilty.

THE DEFENDANT: I became addicted to methamphetamine, and at one point I purchased Sudafed that were used to manufacture methamphetamine.

THE COURT: Did you purchase the Sudafed that were used to manufacture the amphetamines all by yourself in conjunction with somebody else's efforts to manufacture? What else was going on?

THE DEFENDANT: I went to the store basically by myself, but I was told by somebody else to go get it so they could make crank.

THE COURT: So that-so, you had an understanding with somebody else that if you would get Sudafed, what would happen?

---

1. In *United States v. Kinter*, 235 F.3d 192 (4th Cir.2000), the Fourth Circuit was faced squarely with the issue of whether the maximum sentence for *Apprendi* purposes was the statutory maximum or the maximum punishment a judge could impose under the Sentencing Guidelines. *Id.* at 199. While acknowledging that *Apprendi* could be con-strued to prohibit a judge from making factual determinations that raise the defendant's sentence above the Sentencing Guideline range, the Fourth Circuit nevertheless held that the relevant maximum sentence for *Apprendi* purposes was the statutory maximum provided in Title 18 of the United States Code. *Id.* at 200–01.

THE DEFENDANT: Then they would give me some free crank.

THE COURT: After they-

THE DEFENDANT: Yes, sir.

THE COURT: -took the Sudafed?

THE DEFENDANT: Yes.

THE COURT: And did what with the Sudafed?

THE DEFENDANT: They somehow use it to make methamphetamine. And they said they would give me some methamphetamine if I got some Sudafed because I guess it's hard for them to get enough to make enough crank.

THE COURT: Did these acts occur from about April, 2003, until about August 21st, 2003?

THE DEFENDANT: Yes, sir.

THE COURT: A little-do you have some problems with the dates?

THE DEFENDANT: Well, does that mean I did it from April to then or in that period of time it happened?

THE COURT: Well, what you did that would refer to the conspiracy. Was it in that period of time?

THE DEFENDANT: Yes, sir.

THE COURT: That will be good enough. Where?

THE DEFENDANT: At Target Department Store.

THE COURT: And where is that located?

THE DEFENDANT: Charleston, West Virginia, South Charleston.

October 24, 2003, Plea Hearing Transcript at 7–9.

The court then allowed the Assistant United States Attorney, Chad Noel, to make a proffer as to what the United States would have been able to prove against Shamblin had the case gone to trial. Mr. Noel stated that, "Mr. Shamblin was involved in a conspiracy that was per- haps more widespread than what he's lead- ing the court to believe". *Id.* at 9. Noel proffered that two store videotapes showed Shamblin purchasing cold medi- cation, and that the search of Shamblin's home had revealed other precursor materi- als to the manufacture of methamphet- amine and the instructions for making methamphetamine. *Id.* at 9–11. Noel fur- ther proffered that witness statements and the store videotapes were evidence of Shamblin's involvement in a conspiracy with others. *Id.* at 11–12. Shamblin agreed that Noel's proffer was substantial- ly true. *Id.* at 12.

At the plea hearing, the court ordered the Probation Office to conduct a presen- tence investigation of Shamblin and to pre- pare a draft presentence report (PSR). Shamblin's PSR is unusually long. It con- tains, among other things, a number of statements by Carl Elkins, a defendant in a related prosecution. Elkins claims that he met Shamblin in February 2003, and shortly thereafter agreed to begin "cook- ing" methamphetamine for Shamblin. In March 2003, Elkins moved in with Sham- blin. Elkins allegedly completed his first cook for Shamblin that same month, yield- ing 21 grams of methamphetamine. He claims to have completed two more cooks in June and July 2003, yielding approxi- mately twenty-five to thirty-four grams of methamphetamine. During this period, Elkins also allegedly observed Shamblin with six ounces of powder cocaine that Shamblin was converting into cocaine base, or "crack."

Elkins claims to have heard Shamblin make multiple statements about his in- volvement in the drug trade, including the claim that Shamblin had made $70,000 in proceeds from the sale of methamphet- amine between December 2002 and March 2003. Shamblin also, according to Elkins, boasted about having completed four methamphetamine cooks at his home be-

tween June and August 2003. Elkins claims to have once walked in on Shamblin cooking meth in the bathroom while a fourteen-year-old child was in the house.

The PSR contains information from sources other than Elkins. The mother of the fourteen-year-old, Tamra Cummings, has confirmed that her son was present while Shamblin cooked methamphetamine. Cummings and Shamblin also allegedly used the child as a courier to carry methamphetamine out of Shamblin's house shortly before the police searched it. Surveillance videotapes from two Target stores show Shamblin and others, including Cummings's son, purchasing fifteen boxes of Sudafed tablets on two separate occasions.[2]

Another defendant in a related prosecution, Shawn Tackett, claims to have encountered Shamblin at the South Central Regional Jail. Shamblin allegedly told Tackett not to speak to the police. Similarly, recorded telephone conversations reveal that Shamblin, while incarcerated, coached his wife to withhold information from the probation officer.

The PSR contains a great deal of additional information concerning Shamblin's alleged involvement in the manufacture, sale, and use of controlled substances, particularly methamphetamine. I have repeated only the allegations above, however, because they formed the basis of Shamblin's "offense conduct" and "relevant conduct" under the United States Sentencing Guidelines. The offense conduct is comprised of those activities that relate to the conspiracy charged in the indictment. Specifically, the probation officer calculated Shamblin's offense conduct to include the manufacture of 21 grams of methamphetamine (for Elkins's first cook), 25 grams of methamphetamine (as a conservative estimate for the June and July cooks), and 80 grams of methamphetamine (as a conservative estimate for Shamblin's four cooks). Also attributed to Shamblin as offense conduct is the purchase of 37.44 grams of pseudoephedrine. As relevant conduct, the probation officer attributed to Shamblin the possession of 5.5 ounces of powder cocaine and 0.5 ounces of cocaine base. Finally, the probation officer added the $70,000 that Shamblin allegedly made from the sale of methamphetamine sometime prior to the period of the conspiracy alleged in the indictment. For sentencing purposes, all substances, including money, must be converted to an equivalent amount of marijuana so that they can be combined into a single offense level calculation. See U.S.S.G. § 2D1.1. In this case, the offense level calculation was based on the court's finding that all conduct attributable to the defendant was the equivalent of 4,908.98 kilograms of marijuana.[3]

Under the sentencing guidelines, the base offense level for a crime that involves 3,000 to 10,000 kilograms of marijuana is 34. See U.S.S.G. § 2D1.1(c)(3). From this starting point, Shamblin's offense level was greatly enhanced on the basis of specific offense characteristics. For possessing a dangerous weapon, his offense level

---

**2.** Twelve of the boxes contained twenty tablets each, with 120 milligrams of pseudoephedrine per tablet. The three other boxes contained forty-eight tablets of 60 milligrams each. The total amount of pseudoephedrine purchased was 37.44 grams.

**3.** The factors for converting an amount of a substance into an amount of marijuana are found in the Drug Equivalency Tables at U.S.S.G. § 2D1.1. 126 grams of methamphetamine are equivalent to 252 kilograms of marijuana. 155.92 grams (5.5 ounces) of cocaine are equivalent to 31.18 kilograms of marijuana. 14.17 grams (0.5 ounces) of crack cocaine are equivalent to 283.4 kilograms of marijuana. 37.44 grams of pseudoephedrine are equivalent to 374.4 kilograms of marijuana. $70,000 worth of methamphetamine, or the equivalent of 1,984 grams, is equivalent to 3,968 kilograms of marijuana. See id.

was increased by two levels. *See id.* at § 2D1.1(b)(1). For manufacturing methamphetamine and creating a substantial risk of harm to the life of a minor, his offense level was increased by six levels. *See id.* at § 2D1.1(b)(5)(c). For being an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, his offense level was increased by four levels. *See id.* at § 3B1.1(a). For obstructing justice by encouraging Cummings to lie to the probation officer and encouraging Tackett not to talk to the police, his offense level was increased by two levels. *See id.* at § 3C1.1. All told, Shamblin's offense level reached 48. After receiving a three-level reduction for acceptance of responsibility, the offense level was 45.[4] Because the Sentencing Table only reaches 43, Shamblin's total offense level for sentencing purposes was 43. Under the Sentencing Table, the guideline range for a defendant with no criminal history and an offense level of 43 is "life." In accordance with *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), as that opinion was understood in the Fourth Circuit prior to *Blakely,* the maximum sentence that Shamblin could receive was the statutory maximum under 21 U.S.C. § 841(b)(1)(C), or 240 months.

At Shamblin's sentencing, neither Shamblin nor the United States objected to the PSR or the method of calculating Shamblin's offense level and sentence. Accordingly, I sentenced Shamblin to 240 months.

## II. Standard of Review

The defendant bases his motion to correct an unlawful sentence on Federal Rule of Criminal Procedure 35(a). Rule 35(a) states: "Within 7 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." Shamblin asserts that the sentence imposed by the court last week is clear error in light of the United States Supreme Court's holding in *Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Three days after the defendant was sentenced, the *Blakely* Court found that the Sixth Amendment right to jury trial makes unconstitutional the imposition of any sentence above the statutory maximum prescribed by the facts found by a jury or admitted by the defendant. *Id.* at 2536. The issues before the court on this motion, therefore, are whether *Blakely* would have affected the calculation of Shamblin's sentence and, if so, whether the court has jurisdiction to correct the sentence under the clear error standard.

## III. Analysis

A. *Blakely, or Apprendi properly construed, would have affected Shamblin's sentence.*

■ In *Blakely,* the United States Supreme Court considered whether the sentencing procedure followed by courts in the State of Washington deprived the petitioner of his "federal constitutional right to have a jury determine beyond a reasonable doubt all facts legally essential to his sentence." 2004 WL 1402697 at *4. In the state proceedings, the *Blakely* petitioner pleaded guilty to second-degree kidnaping involving domestic violence and use of a firearm.[5] *Id.* at 2534. Under the Washing-

---

**4.** Only in "extraordinary cases" are defendants who receive enhancements for obstruction of justice eligible for the acceptance of responsibility reduction. *See* U.S.S.G. § 3E1.1, Application Note 4. In this case, the reduction was appropriate because Shamblin

pleaded guilty and, after obtaining new counsel, began cooperating with the United States.

**5.** He had originally been charged with first-degree kidnaping, but the charge was reduced upon reaching a plea agreement.

ton Criminal Code, second-degree kidnaping is a class B felony that carries a maximum statutory sentence of ten years. *Id.* The Washington Sentencing Reform Act (the Washington Act) further limited the sentencing range to 49–53 months. *Id.* The Washington Act, however, permitted the judge to impose a sentence above that range upon finding "substantial and compelling reasons justifying an exceptional sentence." *Id.* (citing Wash. Rev Code § 9.94A.210(2)). During the petitioner's sentencing proceeding, the judge imposed an "exceptional sentence" of 90 months. *Id.* at 2535. This enhanced sentence was based on the judge's finding that the defendant used "deliberate cruelty," which is a statutorily enumerated ground for departure in domestic violence cases under the Washington Act. *Id.* The sentence was upheld on rehearing and on appeal to the Washington State Court of Appeals. *Id.* at 2536. The Washington Supreme Court denied discretionary review. *Id.*

On review to the United States Supreme Court, the Court held that the State's sentencing procedure violated the petitioner's Sixth Amendment right to trial by jury under *Apprendi* and its progeny. *Id.* at 2538; *see* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *Apprendi*, the Court determined that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Id.* 530 U.S. at 490, 120 S.Ct. 2348. The Court reasoned that the Due Process Clause and the Sixth Amendment right to a jury trial "indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged beyond a reasonable doubt.'" *Id.*

at 477, 120 S.Ct. 2348. (Internal citations omitted).

Further, in *Ring v. Arizona*, the Court struck down a statute on the basis of *Apprendi*, stating that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt .... A defendant may not be 'expose[d] ... to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (internal citations omitted). In *Blakely,* the Court applied this precedent to the Washington state guideline scheme, explaining:

> our precedents make clear ... that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant* ... In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment ... and the judge exceeds his proper authority.

124 S.Ct. at 2536 (emphasis in original). Thus, the rule of *Apprendi*, as explained in *Ring* and now *Blakely*, establishes that any fact "legally essential to the punishment" must be proven beyond a reasonable doubt to a jury or admitted by the defendant. *Id.* at 9.[6]

---

6. For a thorough and illuminating review of the constitutionality of sentencing guideline schemes raised by *Apprendi* and its progeny, see *United States v. Croxford*, 2:02–CR–00302PGC (C.D. Utah) (entered on June 29, 2004).

The defendant therefore argues that the *Apprendi* line of cases, as clarified by *Blakely*, establishes that his sentence violates his Sixth Amendment right to jury trial and that the court's imposition of this sentence constitutes clear error. Proper analysis of this argument requires the court to (1) determine, in light of *Blakely*, the facts on which it is constitutionally permissible to base the defendant's sentence and the maximum sentence permitted by these facts and (2) compare the maximum sentence permitted to that imposed.

The defendant was not convicted by a jury; rather, he pleaded guilty to the crime of conspiracy to manufacture methamphetamine. The defendant did not plead pursuant to a plea agreement, and the indictment failed to allege a specific amount of methamphetamine. All told, the only conduct admitted by the defendant was his purchase of Sudafed to facilitate the manufacture of, and in exchange for, methamphetamine. To the extent Shamblin agreed that the Assistant U.S. Attorney's proffer was substantially correct, Shamblin also admitted to acting in concert with others to purchase cold medicine and to possessing other chemical precursors to the manufacture of methamphetamine. These admissions are sufficient to sustain Shamblin's plea to the charge of conspiracy to manufacture methamphetamine contained in the indictment; *Blakely*, however, clearly states that a judge may not constitutionally impose a sentence beyond the statutory maximum permitted by facts found by a jury or admitted by the defendant. *Blakely*, at 2536. Therefore, the court may only impose a sentence within the statutory range permitted by these facts.

In light of *Blakely*, the court must determine whether the maximum statutory range is twenty years or whether it is the range permitted under the federal guideline scheme. This determination requires a comparison of the Washington sentencing scheme to the United States Sentencing Guidelines. The Washington Sentencing Reform Act establishes "presumptive sentencing ranges" based on the "seriousness level" of the offense and the defendant's "offender score." Wash. Rev. Code § 9.94A.310(1).[7] The offense seriousness level is determined by the offense of conviction and the offender score is based upon the defendant's criminal history. *Id.* at § 9.94A.350, § 9.94A.320, § 9.94A.360. This presumptive range is adjusted upward if the offender or an accomplice was armed with a deadly weapon. *Id.* § 9.94A.125. The Act requires that the court impose a sentence within the presumptive range unless it finds that "there are substantial and compelling reasons justifying an exceptional sentence." *Id.* at § 9.94A.120. An exceptional sentence is appropriate "when the circumstances of a particular crime distinguish it from other crimes within the same statutory definition." *See State v. Fisher*, 108 Wash.2d 419, 739 P.2d 683, 688 (1987). The act provides a non-exhaustive list of factors the court may consider. Wash. Rev.Code § 9.94A.390. Relevant facts must be proven to the judge by a preponderance of the evidence. *Id.* at § 9.94A.370(2). Ultimately, the defendant's sentence may not exceed the statutory maximum prescribed for the class of felony, even if the presumptive range or an exceptional sentence exceeds this limit. *State v. Gore*, 143 Wash.2d 288, 21 P.3d 262 (2001).

Like the Washington Sentencing Reform Act, which amended the state's criminal code, the United States Sentencing Guidelines have the force of law. *See Stinson v. United States*, 508 U.S. 36, 113

---

**7.** These code references are those employed by the *Blakely* court, which were applicable at the time that the *Blakely* petitioner was sentenced.

S.Ct. 1913, 123 L.Ed.2d 598 (1993). The Sentencing Commission is "fully accountable to Congress, which can revoke or amend any or all of the Guidelines as it sees fit." *Mistretta v. United States*, 488 U.S. 361, 393–94, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). In fact, Congress has recently exercised this authority to amend the Guidelines. *See* PROTECT Act, Pub. L. No. 108–21, § 401(b), (g), (I), 117 Stat. 668–669, 671–673 (April 30, 2003). Moreover, the Guidelines are binding legislative rules that a court must follow to impose sentence. *See Stinson*, 508 U.S. at 42, 45, 113 S.Ct. 1913.

The federal Sentencing Guidelines, however, are structured somewhat differently than the Washington Act. The federal guideline range, unlike the Washington system, is not based solely on the circumstances involved in the actual crime of conviction and the defendant's criminal history. Instead, in addition to the defendant's criminal history, the guideline range depends upon a far more complicated calculus designed to arrive at the "total offense level."

The total offense level is comprised of the "base offense level" and any relevant "specific offense characteristics." *See* U.S.S.G. § 1B1.1. Drug offenses are subject to a particular guideline, but the base offense level is not determined solely by the offense conduct, meaning the facts comprising the crime of conviction. *See id.* at § 2D1.1 Rather, the base offense level is based in part on offense conduct and in part on "relevant conduct." *Id.* Relevant conduct includes "all acts and omissions aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant [and all reasonably foreseeable acts of his co-defendants] that occurred in preparation for the offense or in the course of attempting to avoid detection or responsibility." *Id.* at § 1B1.3(a)(1). Moreover, for certain offenses, including drug offenses, "relevant conduct" includes all acts for which the defendant could be held responsible "that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* at § 1B1.3(a)(2). In sum, relevant conduct enters the offense level calculus from the very beginning and requires an assessment of factors which are not elements of, and may not be factually related to, the charged offense.

In drug cases (like the case before the court), the base offense level is heavily dependent upon the *amount* of drugs involved in the offense. *Id.* at § 2D1.1 Frequently, the specific drug quantity used to calculate the defendant's sentence is neither alleged in the indictment nor admitted by the defendant. Pursuant to the Sentencing Guidelines, the court makes a factual finding as to the quantity of drugs using information compiled by the probation officer in the PSR. This factual finding must be supported by a preponderance of the evidence. *See United States v. Engleman*, 916 F.2d 182, 184 (4th Cir. 1990).

After this base offense level is established, it may be adjusted upward or downward by a number of specific offense characteristics. *See* U.S.S.G. at § 1B1.1(c). The enhancements and reductions, like the factors contributing to the base offense level, must be established by a preponderance of the evidence. *See Engleman*, 916 F.2d at 184. In this case, for example, the defendant received specific offense level enhancements for possession of a firearm, creating a substantial risk of harm to the life of a minor, for being an organizer or leader of a criminal activity that involved five or more participants, and for obstruction of justice.

In *Blakely*, the defendant admitted the elements of the offense, the use of a gun, and the fact that the crime was related to domestic violence. at 2534. These facts established a maximum guideline sentence

of 53 months. *Id.* The facts establishing "deliberate cruelty" were neither admitted by the petitioner nor found by a jury. *Id.* Instead, the judge determined it was more likely than not that the crime was committed with "deliberate cruelty." *Id.* at 2535. The judge therefore imposed an "exceptional sentence" of 90 months. *Id.* This "exceptional sentence" determination under Washington law is not identical to determinations of offense conduct, relevant conduct, or sentencing enhancements under the federal Sentencing Guidelines. *See generally* U.S.S.G. § 1B1.1. In fact, the exceptional sentence is more closely analogous to an upward departure in the Sentencing Guidelines. *See id.* at 5K2.0(2). Both an exceptional sentence and an upward departure allow the court to sentence above the guideline range where the factors establishing the guideline range do not adequately reflect the seriousness of the offense. *Compare* U.S.S.G. § 5K2.0(2), *Fisher,* 739 P.2d at 688.

To the extent that structural differences exist between the Washington Act and the federal Sentencing Guidelines, however, those differences "make the guidelines more vulnerable to attack." 124 S.Ct. at 2549 (O'Connor, J. dissenting). Assessments of relevant conduct and specific offense characteristics apply "hard constraints" to a court's sentencing decision by requiring specific factual findings, whereas an exceptional sentence or an upward departure still allow a court to exercise a significant amount of discretion. *Id.*

▇▇ Accordingly, I **FIND** that the Court's reasoning in *Blakely* is controlling here. The overarching principle articulat-

ed in *Apprendi* is that compliance with the Sixth Amendment requires "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" to be proven beyond a reasonable doubt. 530 U.S. at 490, 120 S.Ct. 2348. The prescribed " 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely,* at 2536. The jury verdict alone—or the defendant's admission alone—"must authorize the sentence." *Id.* at 2538 n. 8. Therefore, the upper bound of the appropriate guideline range, based on facts proven to a jury beyond a reasonable doubt or admitted by the defendant, establishes the relevant statutory maximum for *Apprendi* purposes.[8] Under the federal Sentencing Guidelines, drug amounts, enhancements based on specific offense characteristics, and upward departures all have the same effect—namely, they all *increase* the maximum permissible sentence under the Guidelines. A judge's reliance on such factors at sentencing, if not proven beyond a reasonable doubt, is therefore unconstitutional.

This defendant's admission alone established only that he was a member of a conspiracy to manufacture methamphetamine and that he purchased Sudafed in furtherance of the conspiracy. Under the Sentencing Guidelines, having the force of law, the maximum sentence to which a defendant is exposed based on these admitted facts is 16 months.[9] This defendant was given a deduction for acceptance of responsibility, lowering his offense level, and his maximum sentence, to 12 months.[10]

---

**8.** Here, the indictment failed to state a drug quantity, and the defendant did not admit to a specific drug quantity. Therefore, the controlled substance quantity is deemed to be the smallest amount prosecutable.

**9.** This reflects a base offense level of 12, which provides a range of 10–16 months.

**10.** This is the maximum sentence for a base offense level of 10.

I recognize that this is an artificial application of the Guidelines. As explained above, in drug cases, the amounts of offense conduct and relevant conduct are integral to the determination of a sentencing range. Here, no such amounts were admitted or proven to a jury. Nevertheless, the Guidelines are the *law* which bind this court in sentencing matters, and to the extent that the Guidelines can be applied in a manner consistent with the Sixth Amendment, the court shall strive to do so. *Id.* at 2540 ("This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment.") [11]

### B. The court has jurisdiction to correct a sentence under the clear error standard after controlling precedent overrules the basis for the original sentence.

Rule 35 does not provide a formal procedure for bringing a sentencing error to the attention of the court. Fed. Rule Crim. Pro. 35. The Advisory Committee Notes, however, state that a court may *sua sponte* correct an error in sentencing. *Id.* at Advisory Committee Notes to 1991 Amendments. Accordingly, correction of an error in sentencing does not require an objection by either party. Within seven days of sentencing, the court may independently correct an error in the sentence of the defendant, or as here, may do so on the motion of a party.

The *Blakely* analysis above demonstrates that the defendant's original sentence is in clear error. Misapplication of the Sentencing Guidelines has been found to constitute clear error. *See United States v. Cook,* 890 F.2d 672 (4th Cir. 1989).[12] In *Cook,* the district court judge had stated at the sentencing hearing that the defendant was to be sentenced under a particular section of the Federal Sentencing Guidelines requiring a minimum three month term of imprisonment, but mistakenly sentenced the defendant to three months of community confinement. Neither the defendant nor the government objected to the sentence, and upon realizing the error, the judge *sua sponte* corrected the sentence by imposing the required term of imprisonment. The Fourth Circuit affirmed, holding that the district courts have the power to correct obvious mistakes in sentencing. Similarly, the First Circuit found in *United States v. Goldman,* 41 F.3d 785 (1st Cir.1994), that where the district court made a mistake as to the minimum sentence under the guidelines, the mistake constituted clear error,

**11.** In *United States v. Croxford,* No. 2:02–CR–00302PGC (D.Ut. Jun. 29, 2004), the Honorable Paul G. Cassell noted "three options for dealing with *Blakely*" in terms of a remedy for aggrieved criminal defendants:

(1) the court could convene a sentencing jury, which would determine (presumably by proof beyond a reasonable doubt) whether the facts underlying the enhancement could be proven; (2) the court could continue to follow the other sections of the Guidelines apart from the defective upward enhancement provisions; or (3) the court could treat the Guidelines as unconstitutional in their entirety in this case and sentence Croxford between the statutory minimum and maximum.

After rejecting the first and second options, the court chose the third option "[b]y default...." *Id.,* slip op. at 24. Based on my reading of *Blakely,* I part ways with Judge Cassell concerning a choice between available options. I endorse Judge Cassell's approach, however, to the extent he stresses the continuing necessity of considering all subsections of 18 U.S.C. § 3553 in imposing sentence following *Blakely.*

**12.** The Advisory Committee Notes to the 1991 Amendments state that Rule 35(c) (which is now Rule 35(a)) was intended to codify the Fourth Circuit's holding in *United States v. Cook,* 890 F.2d 672 (4th Cir.1989).

correctable under Rule 35. In *Goldman,* the defendant was convicted of conspiracy to possess and possession of cocaine, with intent to distribute. Based on the quantity of cocaine, the district court found the applicable sentencing range to be 262 to 327 months, and sentenced the defendant accordingly without objection from either party. The prosecutor later filed a motion for correction of sentence under Rule 35, advising the court that the defendant had a prior drug conviction. Within three days of the original sentence, the court held a second sentencing hearing and found clear error in the prior sentence because once the prior drug conviction was considered, the minimum sentence rose to 360 months. The court re-sentenced the defendant to the new minimum.

The *Blakely* decision is based on law in existence at the time of the defendant's sentencing. As noted by the Supreme Court, the decision flowed naturally from *Apprendi* and its progeny. *See Blakely,* at 2536. The failure to recognize defendant's Sixth Amendment rights and apply these rights to the sentencing calculation constitutes clear error. The prior application of several provisions in the Federal Sentencing Guidelines to this defendant's case was unconstitutional. Having recognized this obvious mistake within Rule 35's seven day time period for corrections, I have re-sentenced the defendant accordingly.

## IV. Conclusion

The defendant, Ronald Shamblin, was sentenced last week to 240 months in prison for conspiring to manufacture methamphetamine. Under the Guidelines alone, Shamblin would have received a sentence of life in prison. At the time of his sentencing, however, I understood *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), interpreted by the Fourth Circuit Court of Appeals in *United States v. Kinter,* 235 F.3d 192 (4th Cir.2000), to limit his sentence to the statutory maximum under 21 U.S.C. § 841(b)(1)(C). Today, in light of the United States Supreme Court's recent decision in *Blakely v. Washington,* — U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), I **FIND** that there are further limits on his sentencing range. Based on only those sentencing factors that Shamblin admitted during his plea, I **FIND** that his sentencing range under the Guidelines is 6 to 12 months.

One week ago, Shamblin provided a vivid reminder of the draconian nature of the federal approach to sentencing drug offenders. The offense conduct that Shamblin actually admitted was buying Sudafed in exchange for methamphetamine. His twenty-year sentence was based almost entirely on relevant conduct and sentencing enhancements that were not proven to a jury beyond a reasonable doubt. Some large part of his sentence was attributable to the allegation of a defendant in another case that Shamblin had once boasted about making $70,000 by selling methamphetamine. Today, Shamblin's case illustrates the upheaval that Blakely will cause in federal courts, at least for a time. At 240 months, Shamblin's sentence represented much that is wrong about the Sentencing Guidelines; at 12 months, it is almost certainly inadequate. My duty, however, is only to apply the law as I find it. Accordingly, I have **GRANTED** the defendant's motion.

The court **DIRECTS** the Clerk to send a copy of this Order to the defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal, and **DIRECTS** the Clerk to post this published opinion at *http://www.wvsd.uscourts.gov.*